In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-2463

STEVEN LANG,

*Plaintiff-Appellant,*

v.

ILLINOIS DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 7581—**William J. Hibbler**, *Judge.*

SUBMITTED DECEMBER 16, 2003[Œ]—DECIDED MARCH 17, 2004

Before POSNER, ROVNER, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Steven Lang sued his former employer, the Illinois Department of Children and Family Services (DCFS), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming that after he com-

---

[Œ] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

plained about discriminatory practices he was subjected to "continuing disciplinary charges" and ultimately fired, all in retaliation for his complaints. The district court granted summary judgment in favor of DCFS, and Lang appeals. Because Lang presented sufficient evidence of retaliation, we vacate the judgment of the district court.

We set out the evidence on summary judgment in the light most favorable to Lang. *See Hardy v. Univ. of Ill. at Chicago*, 328 F.3d 361, 364 (7th Cir. 2003). Lang began working for DCFS in 1994, serving as both a child welfare specialist and a case manager. After five years of favorable performance reviews, he was promoted in May 1999 to the position of child protective investigator. Lang was assigned to a team supervised by Karen Beckelman and was one of six investigators who handled cases involving severe child neglect and abuse. The responsibilities of members of this team include handling emergency "mandates," which are orders to locate an endangered child and remove him or her from danger within 24 hours. Because of the urgent nature of these mandates, the office must be able to contact team members on short notice. In September 1999 Lang, a union steward, filed a grievance on behalf of the African-American members of his team (including himself) claiming that DCFS was hindering their ability to perform their duties because it had issued cell phones to the white members of the team but not to the black members.

That same month, Lang's performance reviews changed for the worse. On September 14, a supervisor, Susan Smith, orally reprimanded him for failing to complete a case within 60 days. On September 20, Lang was absent from work, and his supervisors recorded this as an unauthorized absence (UA) on his timesheet. Lang, however, had used authorized leave that day, and when he alerted his supervisors to this fact, they removed the UA. Lang was again given a UA on November 10. But Lang had been at work on that day, and Smith corrected his timesheet when he notified her of the error.

Lang took "family responsibility" leave from December 1999 until February 7, 2000. When he returned, his problems with his supervisors resumed immediately. On February 8, Beckelman reported to her supervisor, Mary Ellen Eads, that Lang's itinerary for that day showed only a single case visit between 9:00 a.m. and 10:30 a.m., but that his timesheet reflected that he had worked until 4:00 p.m. Lang was given another UA. DCFS convened a hearing on February 15 to review Lang's activities on February 8. At the hearing, Lang produced affidavits from his clients that accounted for his whereabouts for the entire day. Once again, the UA was removed from his record.

On the day of the February 15 hearing, Lang filed a charge with the EEOC and the Illinois Department of Human Rights alleging that Beckelman had discriminated against him on the basis of his race. He asserted that Beckelman had refused to approve his requests for overtime pay and a cell phone, and had contacted his clients several times to question his activities. After February 15, the relationship between Beckelman and Lang deteriorated drastically. Beckelman sent Lang over 30 memoranda and e-mails between February and April. These written communications criticized nearly every aspect of Lang's work, including his attendance, the timeliness of his work, his use of time, and the quality of his work product. Beckelman demanded that Lang provide her with detailed itineraries for his days, document his activities, and call her every two hours when he was conducting an investigation out of the office. She also placed him on formal supervision and began reviewing his work on a daily basis. Lang responded in writing to some of these communications, often complaining that Beckelman was being unrealistic in her expectations and that her constant requests for documentation were hampering his ability to perform his duties. He also filed several union grievances. Lang was again given UAs for March 13 and March 16. Like the previous three UAs, the

March 13 absence was later resolved and removed from his record. Lang says that he was sick on March 16 and called into the office that day but was unable to reach anyone. DCFS refused to remove the March 16 absence from Lang's record.

The relationship between Beckelman and Lang reached a boiling point when Lang was absent from work the entire week of March 20. Lang's uncle had become seriously ill, and Lang went to Michigan to care for him. Beckelman issued him UAs for the entire week because she says he never called to report his absence. Lang claims that he called Beckelman's office on Monday, but that neither Beckelman nor her secretary answered her phone. Instead Lang reached Theresa Purchase, a co-worker also supervised by Beckelman, and he asked her to tell Beckelman of his emergency. He also called Rick Navarro, a Labor Relations Liaison in the personnel department, to inform him that he expected to be absent all week. Lang produced telephone records showing that he called the phone numbers for both Beckelman and Navarro on March 20. But Beckelman claims that Lang never properly reported his emergency and, on March 22, she sent a certified letter to his home address demanding that he explain his whereabouts since March 20.

Soon after Lang returned, DCFS began disciplinary proceedings against him, which culminated in Lang's termination on July 13 for accumulating six unauthorized absences: March 16 and March 20 through 24. Lang appealed his termination to the Illinois Civil Service Commission, which upheld DCFS's finding that Lang had six unauthorized absences, but reduced his discipline to a 90-day suspension. That decision was issued in March 2001, eight months after Lang had been fired and three months after he had filed this suit. He did not return to work at DCFS.

We review a grant of summary judgment de novo. *Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.,*

344 F.3d 680, 686 (7th Cir. 2003). To succeed on his retaliation claim via the direct method, Lang would need to show that he engaged in statutorily protected activity, that DCFS subjected him to an adverse employment action, and that the two events had a causal connection. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The district court held that Lang could not rely on the direct method to prove retaliation for his February 15 charge of discrimination because DCFS had already begun disciplining him before that date. The court also analyzed Lang's claims under the indirect, burden-shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). The district court concluded that Lang's claims failed even under this approach because he had not established a prima facie case— specifically, he had not shown that he was meeting DCFS's legitimate expectations or that he had been treated less favorably than similarly situated employees.

Under the direct method, Lang may rely either on direct evidence or circumstantial evidence that would allow a jury to infer intentional discrimination by DCFS. *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003). The parties do not dispute that Lang engaged in protected activity by filing his charge with the EEOC, or that his termination constituted an adverse employment action. Likewise, Lang's union grievance about the racially disparate issuance of cell phones also qualifies as protected conduct because he "opposed" an allegedly racially discriminatory practice by DCFS. *See Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001) ("statutorily protected" activity not limited to filing of EEOC charge). Instead DCFS asserts that Lang produced no evidence under the direct method that would establish a causal link between his discrimination complaints and his termination. We disagree.

Lang points to the short lapse of time between when he filed his complaint with the EEOC and when he began receiving negative reviews from Beckelman. Although a short period of time between the filing of a charge of discrimination and an allegedly retaliatory action is rarely enough by itself to create a triable issue, *Stone*, 281 F.3d at 644, the timing of events "is often an important evidentiary ally of the plaintiff." *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001). Close temporal proximity provides evidence of causation, *Haywood*, 323 F.3d at 532, and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link, *see Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1015 (7th Cir. 1997) (pre-*Stone* case where close timing coupled with other factors established prima facie case of retaliation).

The district court reasoned that "the timing of the discipline is not suspicious at all" because Lang had already been cited for performance and attendance violations prior to the filing of his EEOC charge on February 15. This perspective, however, focuses on too short of a time span by failing to consider events starting in September 1999. *See Sitar*, 344 F.3d at 728 (court may need to examine events over longer period of time). Lang had a five-year record of positive performance reviews (including four months under Beckelman's supervision) until he complained to his union that black employees were not issued cell phones like their white counterparts. The same month he filed that grievance, Lang began receiving "unauthorized absences" that proved to be unjustified. DCFS charged Lang with the first two UAs of his career on September 20 and November 10. Both proved to be unfounded. After Lang returned to work following his extended family responsibility leave, he received yet another UA on his second day back. Like the previous two, this UA also proved to be baseless and it was removed from his record after a hearing. After that hearing

(and Lang's filing of the charge with the EEOC the same day), his supervisor immediately began issuing frequent written reprimands of his work—something she had never done before. From there, the working relationship between Lang and Beckelman collapsed completely, ultimately resulting in Lang's termination.

Viewed in this light, the timing of Lang's discipline is extremely suspicious. DCFS had never criticized Lang's attendance or performance during the five previous years of his employment. Yet in September 1999, the same month he complained about the racially disparate issuance of cell phones on his team, his supervisors began falsely citing him for attendance policy violations. Then, almost immediately after he filed his discrimination complaint with the EEOC, Beckelman began issuing frequent written criticisms of his work. Twice Lang complained about his supervisors' conduct; after his first complaint he was repeatedly cited for unjustified attendance violations, and after his second complaint he received immediate and extensive written criticism from Beckelman.

Moreover, Lang's evidence raises the inference that Beckelman was setting him up to fail by enforcing department policies against him in an unreasonable manner after February 15. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 746 (7th Cir. 2002). For example, Lang sent Beckelman an e-mail complaining about one case she reported as late in which she required him to contact a particular man before closing the file. He wrote that it was impossible to comply with her demands because it was well-documented that the man was in the Philippines and was unreachable, even with the assistance of a Chicago police detective. In another case reported as late, Lang complained that Beckelman refused to approve overtime so that he could visit a family in the evening because he had been unable to reach anyone during the day. He says this made

it impossible to complete the case because he could not conduct the required interview.

The district court noted that Lang received an extremely negative annual performance review from Beckelman in June 2000. But this almost universally negative evaluation could demonstrate either that Lang was not performing his job adequately or that Beckelman was continuing a pattern of retaliation against him by holding him to unrealistic standards. This is not an issue that can be resolved on a motion for summary judgment. Likewise, we note that there is a question as to when Beckelman learned of the charge Lang filed with the EEOC on February 15. The district court said it was undisputed that Beckelman did not learn of it until March 27, and thus could not have retaliated against him for it before that date. But Lang presented a memorandum, dated February 10, that said he was going to file a charge against Beckelman for racial discrimination. Furthermore, he claims that he sent a copy of the charge to her by certified mail on February 29. Moreover, Eads testified in her deposition that EEOC complaints are delivered to her, and that her regular business practice would have been to forward the complaint to Beckelman. As we must construe the evidence in the light most favorable to Lang at this stage of the proceedings, we must assume that Beckelman was aware of the EEOC charge as early as February 10.

Finally, we note that there is a dispute as to whether Lang adequately reported his absences for the week of March 20. On March 22, Beckelman sent Lang a certi- fied letter demanding that he explain his absences, but two e-mail messages from that week suggest that she had learned almost immediately of the reason for Lang's absence. One e-mail, apparently between two personnel em- ployees, says that Beckelman had called to inquire about what type of leave Lang should use for the week. In another e-mail, a union representative wrote to Lang about resched-

uling a meeting; the union representative wrote that Beckelman had told her on March 20 that Lang would be absent "for a few days." These messages suggest that Lang's calls on March 20 served their intended purpose and that Beckelman knew, as regulations require, that Lang had an emergency.

Lang has presented enough circumstantial evidence of a causal link between his protected activity and DCFS's actions to survive summary judgment. Taken together, the extremely short lapse of time between Lang's complaints and the increased discipline he faced, the baseless attendance violations, evidence that Beckelman was holding him to unrealistic standards, and his previous five-year flawless employment record raise the inference of causation. Because we hold that Lang presented enough evidence of retaliation to defeat summary judgment under the direct method, we need not address whether his claim would suffice under the *McDonnell Douglas* indirect burden-shifting method.

VACATED AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*