# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2837

ROSAURA PAZ,

*Plaintiff-Appellant,*

*v.*

WAUCONDA HEALTHCARE AND
REHABILITATION CENTRE, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3341—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED FEBRUARY 24, 2006—DECIDED SEPTEMBER 19, 2006

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Rosaura Paz is a Hispanic woman of Mexican descent. She began working as a cook at Wauconda Healthcare and Rehabilitation Centre ("Wauconda") in December of 2000. After her employment ceased at Wauconda, she filed suit under Title VII for national origin discrimination, pregnancy discrimination, and retaliation. Wauconda moved for summary judgment on all counts, arguing that Paz was not terminated, but instead, had abandoned the job. The district court granted Wauconda's motion and denied Paz's motion for reconsideration. Because there are several issues of material fact in

dispute, we conclude that summary judgment was inappropriate.

Our task in reviewing a summary judgment is to determine whether there are any issues of material fact that require a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). We review the facts in the light most favorable to the non-moving party. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986). Accordingly, we present the events leading up to this suit in the light most favorable to Paz, and note, where appropriate, the conflicting facts as presented by Wauconda.

Paz started working as a cook for Wauconda in December of 2000. She was interviewed and hired for the job by Charlene Li, who became her supervisor. In fact, Li hired Paz on the spot and even had her work a few hours that same day. Li was Wauconda's dietary manager from October 2000 through 2003. During Paz's tenure at Wauconda, Li assigned Paz her work schedule, supervised her job duties, and evaluated her.

In her formal performance evaluation, Paz received an "excellent" rating in all ten categories. She had also received a merit-based pay increase.

Despite her success at work, Paz contends she was subjected to repeated discrimination by her supervisor. Li often made disparaging comments about Mexicans. Notably, other Wauconda employees reported that Li had said several times that "Mexicans cause problems and come to the United States to take away jobs from American people." Wauconda admitted that Li had told at least two other employees that "I am not going to hire any Mexicans as they cause too many problems."

Paz testified at her deposition that, in August 2002, Li had said directly to her, "God, you people just come to [the] United States to cause so many problems and steal American people's job[s]." A co-worker had reported this comment

to an assistant administrator, who in turn questioned Li. Paz also confirmed for the assistant administrator that Li had made the comment but the administrator told Paz not to tell anyone about it and that they needed to keep it confidential.

Paz and other Hispanic employees also reported that Li had treated the Hispanic employees less favorably than their white counterparts. Li had allowed white employees, but not Hispanic employees, to take long, frequent breaks. On one occasion, when Hispanic and white employees had been taking a smoke break together, Li had instructed the Hispanics (including Paz) but not the whites to get back to work. When Li needed something to be cleaned, she would call on one of the Hispanic employees. Li also turned off the radio whenever it was tuned to a Spanish-speaking station and one day, threw Paz's radio away.

At times, white employees were scheduled to have a day off after every two days on while the Hispanic employees were scheduled to work six days straight. Li made Hispanic employees perform the less desirable job duties, such as washing floors and other jobs that were considered the hardest in the kitchen but did not require the same of white employees at the same job level.

Paz also testified that Li started treating Paz differently after learning that Paz was pregnant. When Paz first told Li she was pregnant, Li just shook her head. The next day, Li asked Paz why she wanted more kids, explaining that two kids were enough and that three children would be too hard for Paz. Li then told Paz "[y]ou're not going to be allowed to work, to just start getting . . . . Do you know what, I think you should move to dietary aide instead of be a cook." Li explained that Paz would be better suited for the position of dietary aide since she would not be able to lift heavy objects. Paz explained that she could do her job and that she was only about one or two weeks pregnant.

The following day Li again approached Paz about her pregnancy. Li said to Paz, "Why don't you have an abortion?" Li said that in China, women are only allowed to have two kids, and only one girl. She explained to Paz that it was nothing to feel bad about and admitted to having had an abortion herself. Every day thereafter, Li would tell Paz that she should have an abortion.

Li's comments eventually wore on Paz. Paz cried to her husband and said that she was afraid Li would fire her if she did not have an abortion. After feeling that she had no choice if she wanted to keep her job, Paz told Li she had decided to have an abortion. Paz testified that Li said, "Oh, good for you" and gave her a big hug. For the next two days, Paz said that Li treated her nicely and would laugh and joke with Paz. Paz reluctantly went to the abortion clinic that weekend. The clinic staff told Paz that she was not far enough along in her pregnancy to have an abortion and she would have to come back in a few days. Paz changed her mind when she left the clinic and decided against an abortion.

The following Monday, Paz told Li that she had decided against an abortion. Li shook her head and walked away. Paz testified that since that day, Li had treated her differently and would find excuses to blame Paz for anything that went wrong. Li also would not allow the employees to talk about babies. Wauconda stated that when a white woman was pregnant, Li had made similar comments.

On October 24, 2002, Paz burned one tray of bacon out of several trays she had prepared for breakfast. According to Paz, she put the burned bacon on top of the grill and did not serve it to the residents. According to Li, Paz served the bacon to the residents. Li noticed the burned tray of bacon as soon as she entered the kitchen and began yelling at Paz. She said, "You [are] always wasting food like that. . . . [s]omebody's going to get fired the end of this month." Paz

walked away from Li and started washing dishes at the sink but Li followed her and continued to yell at her. Paz asked why Li was treating her like this lately and Li responded, "You know the reason." Paz burst into tears and a co-worker asked Paz why she let Li scream at her. Paz then went to find Cheryl Morris, Wauconda's acting administrator.

Paz told Morris that Li had been yelling at her and had said that someone was going to get fired at the end of the month. She also detailed for Morris the way Li treated Hispanic employees and told her about Li's comments that she found offensive. Morris told Paz that she was not just the acting administrator, but represented the corporate office as well. Morris testified at her deposition that she told Paz she would take care of it.

Paz told Morris that she was not feeling well and asked for permission to take the rest of the day off, which Morris permitted. When Paz went to retrieve her coat and tell Li she was leaving, Li responded, "If you walk out that door, don't come back." Other Wauconda employees were present during this exchange and corroborated this statement. Paz returned to Morris and told her what Li said but Morris told her not to worry about it and to just go home.

Later that day, Morris spoke with Li and explained Paz's accusations. Li denied the allegations and replied with a list of complaints about Paz. At her deposition, Morris testified that she had responded to Li, "How can you sit here and tell me now that [Paz is] always late, you made a lot of concessions for her, she yells all the time, and not have anything written down . . . . I don't buy it." Still, based on Li's account of the bacon incident, Morris told Li to write Paz up for serving burned bacon.

The next morning, Paz arrived at work at 6:00 a.m. for her scheduled shift. Carla Janacek, a dietary aide, was performing the cooking duties that belonged to Paz. Scott

Rzepka, an employee who was scheduled to be off that day, was performing Janacek's duties. Paz asked Janacek what was going on and Janacek said, "I don't know. Charlene [Li] just told me that she want me to cook." Paz went to check the work schedules posted on Li's door and saw that her name had been crossed off for the previous day and the current day. She also saw that she had not been assigned any days on the new work schedule for the following week. Paz took the schedules down, photocopied them, and replaced them on the door. These work schedules were submitted to the district court.

When Li arrived at work a few hours later she did not say anything to Paz. After a meeting, Li returned to the kitchen where she continued to ignore Paz. Finally, Paz confronted Li and asked her why she was scratched off the schedule and why she had not been assigned any days for the following week. Li replied, "Remember yesterday? You're fired." Paz was stunned and stood at Li's door for a few minutes waiting for an explanation but Li ignored her. Believing she was fired, Paz gathered her belongings and left. Meanwhile, Wauconda contends that Paz walked off the job.

Paz was unaware of the employee warning that Li had filed against Paz the previous day because Li never told her about it. The warning notice criticized Paz for burning the bacon, yelling at Li, and going to Morris "complaining about some other issues that she created to support her anger." The notice also said that when Paz returned to the kitchen on October 24 to say that she was leaving for the day, Li asked her whether that meant she was quitting. Li wrote on the notice that Paz replied, "I don't care, up to you." Paz testified at her deposition that she never said this. Wauconda employees who witnessed the exchange dispute Li's account. Paz also disputes several other items in the warning notice.

Paz was unaware, since Li did not tell her, that once Li told her she was fired and Paz left on October 25, Li wrote a second warning notice. In the warning notice, Li stated that "[e]mployee left the job without telling anybody. Action to be taken—suspension. Consequence should incident occur again—dismissal. Not able to get signature."

On Monday, October 28, Li issued a third and final notice for Paz, and again Paz was not told about it. The third warning notice was for an attendance violation and stated, "No call, no show, job abandonment." Paz, on the other hand, contends the reason she did not show up for work on Monday is because she had been fired on the previous Friday.

At her deposition, Li denied the discrimination allegations and also denied ever pressuring Paz to have an abortion. Li said that Morris had never spoken to her about Paz's discrimination complaint, yet Morris and Wauconda admit that such a conversation took place. Li also denied telling Paz that she was fired. Morris testified that only the administrator had the authority to fire an employee.

Wauconda moved for summary judgment on all counts. The district court granted Wauconda's motion and denied Paz's motion for reconsideration. This timely appeal followed.

## Analysis

Paz argues that factual disputes in the record preclude summary judgment. Specifically, Paz contends that the disputed accounts of her last days on the job at Wauconda illustrate that there are several genuine issues of material fact. We review the district court's summary judgment ruling *de novo. Abdullah v. City of Madison*, 423 F.3d 763, 769 (7th Circ. 2005). As we have explained before, summary judgment briefs that present different versions of the facts

arouse our attention given the standard under the Federal Rules of Civil Procedure. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 753-54 (7th Cir. 2006); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

At summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (citations omitted). Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. Viewing the evidence in the light most favorable to the plaintiff, as we must, we fail to see how the district court granted summary judgment for the defendant. Several factual disputes on material matter are apparent in the record and preclude summary judgment.

We have long held that a plaintiff may defeat summary judgment with his or her own deposition. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003); *see also Payne*, 337 F.3d at 771-73 (evidence presented in a "self-serving" affidavit or deposition is enough to thwart a summary judgment motion provided it meets the usual requirements for evidence at summary judgment stage); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (plaintiff can present deposition testimony demonstrating the existence of a genuine issue of material fact to ward off the grant of summary judgment).

In this case, Paz's deposition testimony is filled with genuine issues of fact based on personal knowledge, and at this stage, the parties still sharply disagree as to whether Paz was fired or abandoned her job. Further, Paz's testimony is not the only evidence that raise genuine issues of material fact; time sheets, work schedules, and co-worker testimony corroborate Paz's case. Paz contends that Li fired her the morning of October 25, 2002. She also submitted time sheets showing that her name was scratched off the

work schedule on October 24 and October 25. Wauconda explains that Paz's name was scratched from the time sheet because it was Li's normal course of conduct to scratch employees names off the schedule if they did not show up for work. Yet this misses a key point—when Paz arrived at work at 6:00 a.m. on October 25 (which is corroborated by her time card), her name was already crossed off the schedule for the day, before Li had even arrived for work herself. Moreover, Li's deposition testimony contradicts that of Wauconda's acting administrator, Cheryl Morris. Li denied ever talking to Morris about Paz's allegations of discrimination. But Morris testified that such a conversation occurred. Dishonesty alone could be a sufficient basis for a jury to conclude that a defendant is covering up a discriminatory motivation for an employee's discharge. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The record here, replete with credibility questions and competing versions of the facts, demonstrates that this case should be sorted out by the trier of fact.

Aside from the open question as to whether Paz was fired or had abandoned her job, Paz's case survives summary judgment based on the direct evidence in the record. A Title VII plaintiff can avert summary judgment "either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719 (7th Cir. 2005) (citation omitted).

The direct method of proof relies on direct and circumstantial evidence to show an inference of intentional discrimination. In other words, we must be able to infer from the evidence that Paz was discharged because of her national origin, pregnancy status, or in retaliation for complaining of discrimination. *Logan v. Kautex Textron N. America*, 259 F.3d 635, 639 (7th Cir. 2001).

Here, a range of direct method evidence precludes a grant of summary judgment: the evidence of Li's discriminatory remarks toward Mexican workers, her comments and behavior toward Paz upon learning that Paz was pregnant, and the curious string of employee warnings against Paz, which coincided with Paz's complaints of discrimination. A trier of fact can infer intentional discrimination on the part of the employer through certain types of circumstantial evidence. For example, we have held that suspicious timing, ambiguous statements, words and actions toward other employees in the protected group, and "other bits and pieces from which an inference of discriminatory intent might be drawn" are among the types of circumstantial evidence that may illustrate an inference of discrimination on the part of the decisionmaker. *Rudin*, 420 F.3d at 720-21 (quotation omitted).

Specifically, Paz and others noted Li's remarks that "Mexicans cause problems and come to the United States to take jobs from American people." On other occasions, Li also told employees that she would not hire any more Mexicans because they just cause too many problems. These statements, combined with allegations of less favorable treatment to Hispanic employees with regard to job duties, breaks, and shift assignments, provide the type of direct method, circumstantial evidence that survives a defendant's motion for summary judgment. Further, Li's comments about Paz's pregnancy, her ability to do her job if pregnant, and repeated suggestions that Paz should have an abortion, all supply an inference of Li's animus to a protected class. Moreover, on October 24, when Li learned that Paz had accused her of discrimination, Li filed an employee warning notice for Paz (Paz's first in almost two years of work) that even referenced Paz's complaint of discrimination. Given the mosaic of direct evidence that Paz presented, we need not use the *McDonnell Douglas* burden-shifting test. *Rudin*, 420 F.3d at 720-21. *See also Walker v. Bd. of Regents of*

*University of Wis.*, 410 F.3d 387, 394 (7th Cir. 2005) ("the key consideration is the totality of these 'pieces of evidence[,] none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.'" (citation omitted)).

It is worth mentioning that the district court and Wauconda were under the mistaken belief that Paz cannot proceed under the direct method because some of Li's comments were made two months prior to her firing. Yet, how recent the comments were, how extreme, and who made the remarks are pieces of evidence that inform whether there was a "mosaic of discrimination." *Walker*, 410 F.3d at 394. At summary judgment, a district court cannot view the record in small pieces that are mutually exclusive of each other.

Finally, we note briefly that whether Li had the power to fire Paz is really a question of apparent authority, not actual authority. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 70-71 (1986) (noting that "courts have consistently held employers liable for the discriminatory discharges by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions.") While the district court and Wauconda say that Paz did not know Wauconda's chain of command, this does not translate into a finding that Li did not have apparent or actual authority to fire her. After all, Li had hired Paz, evaluated her, assigned her work schedule, and oversaw her work duties. Further, we fail to see why, if an employee's supervisor tells her, "You're fired," the employee should run this statement up the ladder just to double-check her status, as Wauconda argues should be the case. Employers are frequently liable for employment decisions made by low and mid-level supervisors, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 771-72 (1998); *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir. 1990), and a similar analysis is appropriate here.

## Conclusion

Given the significant factual disputes in the record, the district court erred in deciding the case on a motion for summary judgment. Accordingly, we REVERSE the judgment of the district court and REMAND for trial.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*