In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3025

ZAFAR HASAN,

*Plaintiff-Appellant,*

*v.*

FOLEY & LARDNER LLP,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5690—**James B. Zagel**, *Judge.*

ARGUED SEPTEMBER 10, 2008—DECIDED DECEMBER 15, 2008

Before COFFEY, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.*  Zafar Hasan, a Muslim of Indian descent and a former associate at the law firm Foley & Lardner LLP ("Foley"), brought this action claiming that Foley had terminated his employment after the terrorist attacks of September 11, 2001, because of his religion, race, national origin and color. The district court granted Foley's

motion for summary judgment. Mr. Hasan now appeals. For the reasons set forth in this opinion, we reverse the judgment of the district court and remand the case for further proceedings.

## I

## BACKGROUND

### A.

In reviewing the district court's grant of summary judgment, we must construe the facts in the light most favorable to Mr. Hasan. *See Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).

Foley invited Mr. Hasan to join the Business Law Department in its Chicago office in October 2000. R.75 at 1-2. At first, Foley was pleased with Mr. Hasan's performance.[1] In a June 2001 evaluation, department chair Edwin Mason and partner Robert Vechiola described Mr. Hasan's performance: "Zafar has a great attitude and is eager to learn. He has good business sense and a great deal of

---

[1] At the beginning of this litigation, Foley maintained that Mr. Hasan's evaluations had been destroyed and that Mr. Hasan had been discharged for poor performance alone. R.77 at 1-2, 18. Foley partners agreed in their depositions that Mr. Hasan's work always had been substandard. R.75 at 10-26. After Foley located the largely positive evaluations, the firm began to claim that Mr. Hasan had been fired because his work had declined and that they lacked work for all but the most talented associates in the department. Appellee's Br. 7.

maturity for his age." R.93, Ex. I1 at 4. The partners also noted, though, that Mr. Hasan needed to pay more attention to detail, develop his substantive skills and submit more polished work to his supervisors. *Id*. Six months later, a group of four partners evaluated Mr. Hasan's work for the period between March 15 and September 15, 2001. R.93, Ex. E1 at 1-5. The partners praised Mr. Hasan as "a hard worker" with a "great attitude" and commented that he managed clients and co-workers exceptionally well. *Id*. at 4. Although the partners repeated their criticisms of Mr. Hasan's drafting skills, efficiency and attention to detail, all of the partners agreed that he was "on track for advancement" and generally exceeded or met the firm's expectations. *Id*. at 5. Mr. Hasan was assigned to work on a large transaction for Foley's client, GMAC, and maintained high billable hours through the late summer of 2001. R.72 at 12-13. As of September 30, 2001, Mr. Hasan had billed 2,467.5 hours, the highest in his practice group. R.77 at 4; R.93, Ex. I1 at 11-19. He also had received praise from both GMAC and his supervising partner for his work on the transaction. R.93, Ex. E1 at 4; R.77 at 5.

### B.

Mr. Hasan and Foley agree that matters changed after the terrorist attacks of September 11, 2001. On the day of the attacks, another Foley attorney heard George Simon, a partner on the firm's Management and Compensation Committees, opine that "those people don't belong here . . . they should kick them all out." R.75 at 7. The other attorney understood Mr. Simon to be talking about Mus-

lims. Mr. Hasan responded to the events of September 11 by publishing articles and appearing on television to publicize his view of Islam as a peaceful religion. R.77 at 3-4. According to Mr. Hasan, when he posted copies of some of his articles on his office door, Foley partner Doug Hagerman warned him to be "careful" and "not to upset any sacred cows." *Id*. at 4. Hagerman asked, "Are you sure you want to have those [articles] up here?" *Id*.

In late 2001, one of Mr. Hasan's supervising partners, Bryan Jung, received an e-mail from GMAC's in-house counsel complaining that Foley had overbilled the project Mr. Hasan had worked on and had provided insufficient and "sloppy" documents. R.93, Ex. A1 at 19-24, Ex. G1 at 1. After investigating the complaint, however, Jung concluded that the problems identified by the client might not have been anyone's fault but instead stemmed from communication gaps among the large number of people working on the project. *Id*., Ex. G1 at 1. At the project's conclusion, GMAC told Mr. Hasan that Foley had done a "great job." R.77 at 5.

After September 11, Mr. Hasan's billable hours began to drop precipitously, while the average hours of other associates in his department increased. R.77 at 4-5; R.93, Ex. I1 at 11-19. Mr. Hasan managed to find work with the firm's litigation group during December of that year, but, in 2002, he billed only 879 hours, the fewest hours billed by any associate in his department. R.77 at 4-5. Most of the department's associates were assigned to work on a second large project for GMAC, called "MINT." *Id*. at 5. Mr. Hasan was not asked to work on MINT, even though he had

requested more work. *Id*. at 6. In fact, even when GMAC representatives asked Mr. Hasan to perform more work for them, Foley did not assign Mr. Hasan to the MINT project. *Id*. at 6. Foley maintains that, although the MINT project occupied many associates, the Business Law Department lacked work generally and, consequently, it assigned what little work there was to its best associates and that Mr. Hasan did not fall into that category. R.72 at 13.

Mr. Hasan's May 2002 evaluation was less positive than his previous evaluations. His supervising partners stated that Mr. Hasan's technical skills were behind his class level. R.93, Ex. A1 at 25. Partners also criticized Mr. Hasan's efficiency, observing that he billed more time than should have been necessary to complete projects. *Id*. Mr. Hasan's evaluators did praise his intelligence, confidence and advocacy skills, but they warned Mr. Hasan that he would be "outplaced" if his performance did not improve by September. *Id*. at 25-26. According to Mr. Hasan, Foley later revised the evaluation, adding that Mr. Hasan had failed to exercise tact with a client in December 2000, some eighteen months earlier. R.77 at 8. The firm also retracted its threat of "outplacement." Instead, it stated that it would simply place a warning in Mr. Hasan's file and evaluate his progress again in September. *Id*.

Six partners evaluated Mr. Hasan's work in his next review. Most of the partners agreed that Mr. Hasan's work met or exceeded firm expectations. R.93, Ex. E1 at 6. Peter Schaafsma, with whom Mr. Hasan had worked the most, reported that Mr. Hasan was "one of his corporate 'go to guys'" and was "a joy to work with." *Id*. at 9. Todd Pfister,

for whom Mr. Hasan had done little work, was not as positive: "For various reasons, a number of partners seem to have lost confidence in Zafar. As a result, his workload has diminished substantially and he is falling farther behind in his professional development." *Id*. Pfister concluded that the firm needed to "address this situation promptly." *Id*. A third partner, Robert Vechiola, mentioned Mr. Hasan's low hours but noted that Mr. Hasan was willing "to do anything to improve his hours, including relocating to another office and/or working with other departments." *Id*. After Schaafsma submitted his glowing evaluation of Mr. Hasan's work, Mason (the department chair) told him that his praise was inconsistent with the other partners' assessments and asked him to explain his review. R.77 at 10. In his deposition, Schaafsma stated that he was surprised that other partners had given Mr. Hasan negative reviews and believed that Mason was trying to convince him to retract his praise for Mr. Hasan's work. R.77 at 10-11.

Mr. Hasan states that, in October 2002, Vechiola assured him, based on a conversation between Vechiola and Mason, that "there was no basis" for firing Mr. Hasan. R.77 at 11. Vechiola does not recall whether that conversation ever occurred. R.77 at 11-13. In any event, in October 2002, Mason chaired a meeting to evaluate the department's associates. R.75 at 40-41. Partner John Cleary attended the meeting and later testified that, at the meeting, Simon (the partner who made the "kicking out" comment on September 11) criticized Mr. Hasan's performance, even though Simon never had worked with Mr. Hasan. R.77 at 13. Ultimately the partners decided to terminate Mr. Hasan's

employment. *Id*. In a later conversation with Cleary, Vechiola described the meeting as a "sand nigger pile-on" and reported that, after Simon criticized Mr. Hasan, the rest of the partners joined in. *Id*. Mr. Hasan says that Vechiola told him that it was "too bad that [Simon] and those guys took out their religious dispute in Israel on you and had you fired." *Id*. Vechiola, however, does not recall having made that statement. R.96, Ex. P at 70-72. Foley maintains that no partners participating in the decision to fire Mr. Hasan discussed Islam or September 11 during the meeting. R.72 at 17.

Mason then e-mailed the firm's nationwide managing partner, Stan Jaspan, to tell him that he planned to fire Mr. Hasan. R.93, Ex. F1 at 1. He noted that the decision was not unanimous and that he had "further background informa-tion" that he wanted to tell Jaspan by phone. *Id*. Mason admitted at his deposition that the "background informa-tion" that he wanted to convey to Jaspan was the fact that Mr. Hasan was a Muslim. R.77 at 15. Mason explained that he told Jaspan that Mr. Hasan was a Muslim because he was concerned that Mr. Hasan "could potentially bring a claim" against the firm. *Id*. at 15-16.

Although Jaspan gave Mason permission to fire Mr. Hasan, the firm held back. In November 2002, Jaspan and another lawyer, Joseph Tyson, began searching for a job for Mr. Hasan at one of Foley's other offices. R.77 at 16. Tyson stated in his deposition that the search was unusual given that the firm already had decided to terminate Mr. Hasan's employment. *Id*. On November 22, Tyson e-mailed Jaspan to tell him that he had had no luck finding a job in another

Foley office for "the well educated Muslim in Chicago." *Id*. Tyson stated that Mr. Hasan was "bright, motivated, willing to travel anywhere." *Id*. Tyson also observed that as a general rule, Foley terminated associates either because their performance was lackluster or because they did not have enough work and that he would consider a transfer only for an associate let go for lack of work. *Id*. Nonetheless, Tyson and Jaspan were unsuccessful in placing Mr. Hasan elsewhere.

Mason informed Mr. Hasan in early December that Foley was terminating his employment because of "deficiencies in performance" and "a perception that he was behind the level of where he should be" professionally. R.93, Ex. I at 96-98. Mason explained that the Business Law Department did not have enough work and that, because Mr. Hasan had "lost the confidence of a sufficient number of partners," the firm did not think it likely that Mr. Hasan would "receive enough work in the future." *Id*. Mr. Hasan responded that Vechiola had told him there was no basis for firing him, but Mason explained that the partners had reached a different conclusion. R.77 at 17.

Foley permitted Mr. Hasan to remain at the firm for six months following his termination. Mr. Hasan claims that Pfister told him, in February 2003, that Simon previously (and unsuccessfully) had tried to derail the promotion of a pregnant associate eligible for partnership. R.77 at 18. According to Mr. Hasan, Pfister reported that Simon laughed when another partner told him that such action was inappropriate and that it was Pfister's opinion that Simon disregarded employment laws. *Id*. Pfister told Mr.

Hasan that Simon had "done the same thing" to Mr. Hasan that he had tried to do to the pregnant associate. *Id*. Mr. Hasan ultimately left his employment with Foley on June 13, 2003. R.75 at 51.

During the time Mr. Hasan worked at Foley, the Business Law Department employed two other Muslim associates. R.75 at 49. Foley placed one of those associates on probation in May 2002 and then transferred her to the firm's litigation group in 2003. *Id*. Foley terminated the other Muslim associate's employment shortly after Mr. Hasan left the firm. *Id*. Foley notes that another Muslim lawyer has worked at the firm since 1996 and became a partner in 2006, but, at oral argument, Foley conceded that the Muslim partner was not in the Business Law Department.

About two weeks after Mr. Hasan left the firm, two Foley partners circulated a memo to the entire Chicago office in which they boasted that the firm's "financial picture is strong" and that "profits per equity partner" for 2002 exceeded the prior year's profits by twenty-five percent. R.96, Ex. H at 35-36. According to one partner, Foley did not terminate any other attorneys between 2001 and July of 2003 for economic reasons. *Id*. at 36-37. Mason testified at his deposition that Foley had fired other associates for lack of work, although he could recall only a few of those associates' names and did not know the circumstances under which they had been fired. R.95, Ex. 13 at 109-11. At oral argument, Foley's attorney admitted that the firm had not fired any other associates in the Business Law Department for economic reasons. In the fall of 2002, the Business Law Department hired new associates from Foley's

summer associate class to begin work in 2003. R.77 at 22; R.95, Ex. 13 at 111-12.

## C.

Mr. Hasan timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). He alleged that Foley had fired him because he is Muslim, a South Asian of Indian origin and has "brown and olive" skin. R.93, Ex. A1 at 27. Mr. Hasan later filed a second EEOC charge in which he claimed that Foley retaliated against him for filing his first EEOC charge by threatening to sue him for allegedly disclosing confidential information.[2] *Id*. at 42. The EEOC issued right-to-sue notices for both charges on June 10, 2004, and Mr. Hasan timely filed suit in August, claiming that Foley had fired him in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17. R.1 at 1.

The district court granted Foley's motion for summary judgment; it concluded that Mr. Hasan had failed to create a "convincing mosaic" of direct or circumstantial evidence that could permit a jury to conclude that Foley intentionally discriminated against him. *Hasan v. Foley & Lardner, LLP*, 2007 WL 2225831, at *8-9 (N.D. Ill. Jul. 26, 2007). The court observed that Simon, the partner who exclaimed that Muslims should be "kicked out," was not Mr. Hasan's

---

[2]  Foley did file counterclaims against Mr. Hasan, but the district court granted Mr. Hasan's motion for summary judgment. Foley does not challenge that decision on appeal.

direct supervisor and concluded that Simon's presence on the firm's Management and Compensation committees did not prove that he "wield[ed] any power over the other partners." *Id.* Moreover, continued the court, Simon's comment could not be evidence of discriminatory intent because it was made on September 11, 2001, a year before Mr. Hasan's employment was terminated. The court also rejected Mr. Hasan's arguments that the timing of the decrease in his billable hours was suspicious and that Foley's treatment of other Muslims in the Business Law Department was evidence of discrimination. Although the court concluded that Mr. Hasan had presented a question of fact on the issue of his job performance, it apparently believed that performance was relevant only under the indirect method of proof and therefore could not preclude judgment for Foley under the direct method. Finally, the court granted summary judgment in Foley's favor on Mr. Hasan's retaliation claim because it concluded that filing a lawsuit, much less threatening one, could not amount to retaliation unless it was an abuse of process. Mr. Hasan appeals only the judgment on his discrimination claims.

## II

## DISCUSSION

### A.

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the non-moving party's favor. *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). Summary judgment is proper if the

pleadings, discovery and disclosure materials on file, as well as any affidavits, demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c). The district court may not weigh the evidence or engage in fact-finding but should simply determine whether there is a genuine issue for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

Mr. Hasan elected to proceed under the so-called "direct" method of proving discrimination. *See Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Despite its name, proof of discrimination under the direct method "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion." *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1052 (7th Cir. 2006). Rather, an employee also can provide circumstantial evidence "which suggests discrimination albeit through a longer chain of inferences." *Id.* The key to the direct method of proof is that the evidence, whether direct or circumstantial, "'points directly' to a discriminatory reason for the employer's action." *Atanus*, 520 F.3d at 671 (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 n. 3 (7th Cir. 2006)). There are three categories of circumstantial evidence, each of which can establish discrimination under the direct approach. *Venturelli v. ARC Cmty. Servs., Inc.,* 350 F.3d 592, 601 (7th Cir. 2003).[3] Mr. Hasan primarily relies on the first category, which includes "suspicious timing, ambiguous oral or written statements, or behavior toward or com-

---

[3]  *See* note 4, *infra*.

ments directed at other employees in the protected group."
*Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 491 (7th
Cir. 2007) (internal quotation marks and citation omitted).
Some of Mr. Hasan's evidence is also relevant to pretext,
which falls into the third category and includes evidence
"where the plaintiff is qualified for and fails to receive the
desired treatment, and the employer's stated reason for the
difference is unworthy of belief." *Kennedy v. Schoenberg,
Fisher & Newman, Ltd.,* 140 F.3d 716, 725 (7th Cir. 1998)
(internal quotation marks and citation omitted).

**B.**

   Mr. Hasan submits that the facts in the record, while
possibly weak proof of discrimination individually,
together would allow a jury to infer that Foley terminated
his employment because he is Muslim and of Indian
descent. *See Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737
(7th Cir. 1994) (holding that a plaintiff may prove discrimi-
nation through evidence of "ambiguous statements,
suspicious timing, discrimination against other employees,
and other pieces of evidence none conclusive in itself but
together composing a convincing mosaic of discrimina-
tion"). Those facts include Simon's and Hagerman's anti-
Muslim comments, Mason's warning to Jaspan about Mr.
Hasan's religion, the suspicious timing of the downturn in
his hours and evaluations following September 11, one
partner's testimony that Foley fired no other associates for
economic reasons and did well financially in 2001 and
2002, the Business Law Department's treatment of its other

Muslim associates and Foley's shifting justifications for firing Mr. Hasan.

Addressing the evidence Mr. Hasan put forward, the district court concluded that Simon's comment that Muslims should be "kicked out" was not valid circumstantial evidence of discrimination because Simon was not Mr. Hasan's direct supervisor. The court distinguished this case from our decision in *Paz v. Wauconda Healthcare & Rehabilitation Center, LLC,* 464 F.3d 659, 666 (7th Cir. 2006), by pointing out that the discriminatory statements in that case were made by the plaintiff's direct supervisor. *Paz* does not require, however, that a court ignore comments made by someone who is not directly responsible for an employee's supervision. Rather, derogatory remarks are relevant if they are made by someone who provided input into the adverse employment decision. *See Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001) (quoting *Hunt v. City of Markham, Ill.,* 219 F.3d 649, 652 (7th Cir. 2008)). The record shows that Simon attended the meeting at which the partners decided to fire Mr. Hasan and that he participated in that decision. That others were also involved in making that decision does not make Simon's participation irrelevant. *See Lewis*, 496 F.3d at 652 (holding that discriminatory comments by someone "involved" in an employment decision may be evidence of discrimination); *Hunt*, 219 F.3d at 653 (holding that discriminatory comments by someone who "influenced" an employment decision may be evidence of discrimination). There is also evidence in the record that Simon's criticisms at that meeting incited anti-Muslim and racially charged commentary from other partners. Vechiola's description of the

meeting as a "sand-nigger pile on" suggests as much, as does Pfister's comment that Simon had targeted Mr. Hasan just as he had targeted another lawyer, albeit unsuccessfully. Viewing the facts in the light most favorable to Mr. Hasan, the record would allow the rational inference that Simon not only participated in the decision to fire Mr. Hasan but also may have instigated it.

The district court also concluded that Simon's comment could not be evidence of discriminatory intent because he expressed his anti-Muslim sentiments on September 11, 2001, a year before Mr. Hasan was fired. The recency of discriminatory comments, together with who made the comments and how extreme those comments were, is relevant to whether they help to build a total picture of discrimination. *Paz*, 464 F.3d at 666. But the district court may not view recency alone as the decisive factor. *Id.; see also Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (holding that the district court focused on too short a time span). Moreover, Simon and Hagerman made their comments around the time that the Business Law Department began to steer work away from Mr. Hasan, which was a factor upon which they ultimately relied to fire him. *See Lang*, 361 F.3d at 419-21 (holding that, viewed in the long term, employee's record of positive performance reviews followed by over a year of reprimands culminating in his termination was evidence of retaliation); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (noting that the court may need to examine events over a longer period of time).

The district court also believed that the fact that Mr. Hasan's hours fell after September 11 did not, on its own,

raise any suspicions. Suspicious timing is, however, relevant to whether an employer's conduct was discriminatory. *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[S]uspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link."). Moreover, evidence that would be weak if considered alone can, if bolstered by other facts in the record, support an inference of discrimination. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); *Troupe*, 20 F.3d at 736. Mr. Hasan's post-September 11 decrease in hours alone may not carry much meaning, but it gains substantial significance in the context of (1) partners' anti-Muslim comments, (2) their refusal to give him work even when he asked for it, (3) Mr. Hasan's good relationship with the department's primary client, (4) Mr. Hasan's previous positive performance reviews and (5) the fact that other associates had sufficient work and even increased their hours on average during the relevant period.

The district court next interpreted Mason's e-mail and phone call to Jaspan regarding Mr. Hasan's religion as evidence that the firm paid attention to equal employment laws. A jury could infer, however, that Mason wanted to talk to Jaspan without leaving a written record precisely because he was worried that Foley had fired Mr. Hasan unlawfully. Such an inference is particularly strengthened by the anti-Muslim comments in the record. This is exactly the type of ambiguous fact, susceptible to competing interpretations, that should be evaluated by a fact-finder. *See Paz*, 464 F.3d at 665.

The district court also held that Mr. Hasan's evidence regarding Foley's treatment of other Muslims in the Business Law Department was irrelevant to his discrimination argument. Our precedents establish, however, that "behavior toward or comments directed at other employees in the protected group" is one type of circumstantial evidence that can support an inference of discrimination. *Hemsworth*, 476 F.3d at 491; *see also Phelan v. Cook County*, 463 F.3d 773, 781 (7th Cir. 2006). The Supreme Court also has held that this kind of "me too" evidence can be relevant to a discrimination claim. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S. Ct. 1140, 1147 (2008) (discussing evidence of discrimination by other supervisors in the context of an ADEA suit); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285-86 (11th Cir. 2008) (upholding admission of evidence of racial discrimination against other employees to prove an employer's intent to discriminate). The Court made clear that the relevance of "me too" evidence cannot be resolved by application of a per se rule. *Sprint*, 128 S. Ct. at 1147. Instead, whether such evidence is relevant depends on a variety of factors, including "how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.*; *see also* Fed. R. Evid. 401, 403. Rather than dismiss this evidence as irrelevant per se, the district court should have analyzed whether, if proven, the fact that Foley fired or transferred all other Muslim associates from its Business Law Department would be a relevant component of the "mosaic" of evidence.

Foley submits that its treatment of other associates matters only if Mr. Hasan can show that the firm gave

preferential treatment to similarly situated non-Muslim employees. Mr. Hasan cannot prevail, Foley contends, because he has not produced any evidence regarding similarly situated employees. This argument confuses the direct method of proving employment discrimination with the indirect method. It is true that, under the indirect method of proof, a plaintiff must produce evidence of how the employer treats similarly situated employees. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008); *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830 (7th Cir. 2007). But the direct method of proof imposes no such constraints.[4] *See Faas*, 532 F.3d at 641. In fact, one reason a plaintiff might select the direct method of proof rather than the indirect is that, as Mr. Hasan's attorney explained at oral argument, there simply are no similarly situated employees. Mr. Hasan chose to make his case under the

---

[4]   Under the direct method of proof, circumstantial evidence of discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment" and (3) evidence "where the employee was qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief." *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 725 (7th Cir. 1998). Thus, although evidence of preferential treatment of similarly situated employees can be relevant under the direct method of proof, Mr. Hasan was under no obligation to present such evidence.

direct method of proof, and, therefore, Foley's argument is unavailing.

Finally, the record, viewed in the light most favorable to Mr. Hasan, supports neither of Foley's purported reasons for firing Mr. Hasan. Foley initially claimed that it fired Mr. Hasan for poor performance. With the exception of Schaafsma, who is no longer at the firm, Mr. Hasan's supervising partners all testified at their depositions that, at the time Mr. Hasan was fired, his work was uniformly unacceptable. However, after Foley located Mr. Hasan's work evaluations, which were mostly positive, the firm changed its tune, maintaining that it actually fired Mr. Hasan not because his work was unacceptable but because it only had enough work to keep the best associates in the department occupied. Moreover, Mason's attempt to convince Schaafsma to retract his praise for Mr. Hasan's work permits an inference that the Business Law Department intended to sabotage Mr. Hasan's evaluations. This contradictory evidence calls into question the credibility of the partners' deposition testimony; credibility determinations are reserved to the jury. *See Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001). Indeed, the district court acknowledged this inconsistency when it recognized that Mr. Hasan had presented a genuine issue of material fact on the question of performance. Issues of material fact cannot be resolved on summary judgment. The firm cannot, therefore, avoid trial by claiming that its real reason for firing Mr. Hasan was his supposed poor performance, when there is an issue of material fact as to whether this proffered reason is merely a pretext. *See Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743-44 (7th Cir. 2008) (considering

relevance of pretext to direct method of proof of discrimination); *Piraino v. Int'l Orientation Res., Inc.,* 84 F.3d 270, 275 (7th Cir. 1996) (same); *see also Gates v. Caterpillar, Inc.,* 513 F.3d 680, 691 (7th Cir. 2008) (explaining that pretext means that employer's proffered reason for firing employee was a lie).

A reasonable jury could also find that Foley's alternative explanation—that it fired Mr. Hasan because the firm did not have enough work for all the associates in the Business Law Department—is pretextual as well. The record is inconsistent as to whether Foley fired any associates in the Business Law Department other than Mr. Hasan for lack of available work during the economic downturn, although, at argument, Foley's lawyer assured us that it had not. One partner reported that Mr. Hasan was the only associate fired for lack of work; another testified at his deposition that Foley had dismissed other lawyers because of the economic climate. And the internal firm-wide memo claimed that Foley's economic performance in 2001-2002 was strong, while Foley now contends that the firm was in a downward spiral that required it to jettison Mr. Hasan. A jury could reasonably infer from these facts that Foley partners directed work towards other, non-Muslim associates in the Business Law Department in order to use Mr. Hasan's lack of work as a pretext to fire him. Similarly, it is unclear from the record why Foley hired new associates into its Business Law Department immediately after firing Mr. Hasan. It is possible that the firm lacked work for mid-level associates with Mr. Hasan's skill set and instead needed attorneys with different experience or training. A jury could also conclude, however, that the Business Law

Department hired new associates because it actually had plenty of work. This issue cannot be resolved at summary judgment; a fact-finder must decide which interpretation of the record is correct. *See Paz*, 464 F.3d at 665.

Putting together these items of circumstantial evidence, a reasonable jury could conclude that Foley terminated Mr. Hasan's employment because he is Muslim and of Indian descent. That "mosaic" of evidence, together with the unresolved questions of fact, is sufficient under the direct method of proof for Mr. Hasan to survive summary judgment on his discrimination claims.

## Conclusion

Accordingly, the judgment of the district court is reversed. The case is remanded to the district court for proceedings consistent with this opinion.

REVERSED and REMANDED