Joseph L. HUDSON IV, Plaintiff,

v.

LANDS' END INC., Defendant.

No. 12–cv–64–bbc.

United States District Court, W.D. Wisconsin.

March 6, 2013.

Mary E. Kennelly, Fox & Fox, S.C., Monona, WI, for Plaintiff.

Mark A. Johnson, Timothy G. Costello, Krukowski & Costello, S.C., Milwaukee, WI, for Defendant.

## OPINION AND ORDER

BARBARA B. CRABB, District Judge.

The question in this case is whether defendant Lands' End Inc. fired plaintiff Joseph Hudson IV from his job as general merchandising manager of the Men's Division because of his age, in violation of the Age Discrimination in Employment Act. 29 U.S.C. § 623. Defendant has filed a motion for summary judgment under Fed. R.Civ.P. 56, in which it contends that no reasonable jury could find in plaintiff's favor. Dkt. # 20. Because I conclude that genuine issues of material fact remain about defendant's decision to terminate plaintiff, I am denying defendant's motion for summary judgment.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Defendant Lands' End is a direct merchant of apparel, swimwear and outerwear for women, men and kids, as well as a line of home products, luggage and seasonal gifts. It offers these products to customers worldwide through catalogs and the internet. Plaintiff Joseph Hudson began working for defendant in May 1988 as a product manager in the Men's Division.

### B. *Plaintiff's Promotion to General Merchandise Manager of the Men's Division*

In 2006, defendant terminated the general merchandise manager for the Men's Division and began searching for a new

manager. Generally, defendant filled general merchandise manager positions from outside the company rather than promoting internally. However, defendant did not find a outside candidate to fill the position and in September 2007, it offered the position to plaintiff. Plaintiff was 53 years old at the time.

Three people participated in the decision to promote plaintiff: David McCreight, President and CEO of defendant at the time; Lisa Fitzgerald, Executive Vice President of Merchandising, Design and Creative; and Kelly Ritchie, Senior Vice President of Employee Services. McCreight thought plaintiff had knowledge of defendant's customers, products and how to create a catalog page. He also enjoyed listening to plaintiff's presentations and thought plaintiff was articulate. Fitzgerald made the ultimate decision to promote plaintiff and discussed the promotion with him. She told plaintiff that she and McCreight believed he had earned the promotion and that they were pleased to recognize his efforts. Plaintiff accepted the promotion and Fitzgerald issued an announcement, praising plaintiff's teamwork, merchandising skills, financial acumen and "incredible knowledge" of defendant and its customers. Dkt. # 29–1.

As general merchandise manager for the Men's Division, plaintiff was accountable for the merchandising strategy and financial plan for the division. He was expected to have a strong knowledge of the industry and marketplace and the ability to translate that knowledge to the building of a product assortment that was appropriate and profitable. He performed and supervised the key functions related to merchandising, sales and inventory planning, design, sourcing, quality, catalog, creative planning and communications. From September 2007 until February 2008, plaintiff reported to Stephanie Pugliese, Senior Vice President of the Men's and Women's Divisions. From February 2008 to March 2009, plaintiff reported to Tara Ellef, Senior Vice President of Merchandising. After Ellef left the company in March 2009, plaintiff reported to Fitzgerald.

In 2008, Pugliese evaluated plaintiff's performance for his first four months as general merchandise manager. She gave him an overall rating of "effective," noting that plaintiff was "extremely thoughtful, communicative, and assertive" in his approach to building the business, "very astute at creating profitable alternatives and opportunities," "an effective communicator [who] keeps all parties well-informed of strategies and execution plans" and "well spoken and articulate" in his presentations. Dkt. # 29–2.

## C. Decline of Sales and Promotional Activity

From about the year 2000 onward, the sales volume of the Men's Division had been declining while sales in the Women's Division had increased. By 2008 or 2009, the Women's business was larger than the Men's business. Additionally, since about the year 2000, the Women's Division received a greater share of the catalog investment than the Men's Division.

In 2008, Men's net sales declined by approximately $15,000,000. Net sales also declined for the Women's, Kids and Home divisions that year. This was partly anticipated, as the financial goal for the Men's Division in 2008 was lower than both the 2007 goal and actual sales. Despite the lower net sales, the Men's Division ended 2008 with higher "initial and final fill," lower returns, 16% lower inventory and 14% "lower sku's," none of which occurred in other business divisions.

Defendant used company-wide promotions in 2008 and 2009 to increase sales. Plaintiff was not involved in the decision to use promotions and the Men's Division did

not use any promotions that were specific to Men's.

### D. *Creation of the "New Traditionalist" Line*

As general merchandise manager, one of plaintiff's primary roles was to add revenue and profit through product development and new marketing strategies. Plaintiff initiated a new style of presentation that grouped products by design theme and connected products with marketing ideas. Plaintiff's new presentation style allowed management and other departments to understand the visual message that Men's was seeking to impart.

In November 2007, plaintiff suggested a new approach to revitalizing defendant's image with its traditional customers. The approach, called the "essentials project," was intended to "refresh" product assortment without adopting product that was too young-looking, young-fitting or trendy for defendant's "traditional" customer. Plaintiff asked senior designer Ernesto Ramirez to select ten of defendant's garments that he thought were essentials for every "traditional" customer. Plaintiff and Ramirez then created a pin-up wall to display the essential products. Plaintiff also asked Ramirez to select magazine photographs that best depicted how the traditional customer would like to see his merchandise presented in an advertisement. This exercise, which was done in concert with the Merchandising and Design teams, took several weeks and served to refine the company's understanding of the traditional Men's customer. As a result of this effort, the Men's Division offered a new product called "Paintbrush shirts" that generated $849,000 in new revenue in the Spring and Summer 2009 season.

Around the same time that plaintiff was working on the "essentials project" with Ramirez, plaintiff and Ramirez initiated a new concept for the Men's Division that targeted a younger market and those with a different style from that of the "traditional" Men's customer. Plaintiff organized a buying trip to Manhattan to visit men's shops and department stores and evaluate current and future competitors, investigate fit, design and presentation trends and to buy samples. In February 2008, plaintiff asked Ramirez to create a pin-up wall that exhibited the clothing products that would be appealing to a demographic distinctly different from plaintiff's traditional customer. This led to the designation of "Classic," which referred to the traditional customer and the "New Traditionalist," which referred to the new customer.

In June 2008, a business review meeting was held for the "Classic" products that would be marketed for Spring and Summer 2009. Plaintiff made a presentation to McCreight and Fitzgerald and the leaders of the Finance, Inventory, Design, Creative and International divisions that summarized the forecasts, potential projects and critical needs for the Men's Division. The entire Spring and Summer 2009 line was developed around the "classic" customer and McCreight and Fitzgerald approved the Men's merchandising approach without changes. Immediately following the business review meeting, plaintiff and Ramirez showed McCreight, Fitzgerald and others the New Traditionalist concept display wall for the first time, presenting it as a possible new Men's apparel line. Everyone present was positive and enthusiastic.

### E. *Nick Coe becomes President of Defendant*

In July 2008, McCreight left the company. In December 2008, Nick Coe joined the company as the new president. Shortly after he joined the company, Coe started asking Kelly Ritchie, Senior Vice President of Employee Services, whether

plaintiff was the "right person" to fill the position of Men's general merchandise manager. In early 2009, Coe told Fitzgerald that plaintiff appeared to be struggling to run his business. He told her that plaintiff was incapable of answering questions of "what was wrong with his business" and "what he was going to do about it." Coe asked Fitzgerald what she was going to do about it.

Coe testified at his deposition that plaintiff was not capable of doing his job and that he struggled to answer questions at business review meetings about what was wrong within the business and what he was going to do about it. Coe Dep., dkt. # 14, at 6–7. (Coe could not recall any specific questions that he asked plaintiff that plaintiff was not able to answer.) Coe also testified that he believed the Men's Division under plaintiff was not meeting its financial goals. *Id.* at 8. (This was incorrect.)

By the time Coe joined the company, the Men's team was preparing to launch the New Traditionalist line. In January 2009, Ellef, plaintiff's supervisor at the time, decided to present the "mock up" display to Coe at a business meeting. Ellef directed then 38–year old Suzanne Bryant, Head of Design, to be the designated presenter and instructed plaintiff and Ramirez to "take a back seat" during the meeting. Coe was impressed with the display and enthusiastic about the New Traditionalist concept. By March 2009, Coe was referring to the new customer as "Jack" and the classic customer as "Gary." By June 2009, the New Traditionalist concept was called "Canvas." The Women's Division began adapting the fixtures and visual props from "Jack" to create a Canvas line for the Women's Division.

### F. Plaintiff's 2008 Performance Review

Defendant evaluates employee performance for each fiscal year, which ends approximately January 31. Performance evaluations consist of two parts: a "self-appraisal" form completed by the employee and a "leader assessment" completed by the employee's supervisor. The supervisor then assigns an overall rating. General merchandise managers are evaluated using three key financial metrics: (1) net sales; (2) fill; and (3) variable profit. These three financial metrics constitute 60% of the year-end performance appraisal. The other 40% consist of non-financial factors, such as leadership and communication skills.

Plaintiff's self-assessment of his 2008 performance was due by February 6, 2009. At the time he completed his self-assessment, the finance department had published and distributed year-end numbers showing that plaintiff had missed his goals with respect to net sales and variable profit. Believing he had failed to meet two out of three of his financial performance goals, plaintiff scored himself as "inconsistent" overall in the value assessment portion of his review. An "inconsistent" rating was second from the bottom of a range of five ratings, with the only lower possible rating being "unacceptable." Under "Development Needs & Action Plans," plaintiff wrote that he needed to better understand customer preferences, how to "position [the] digital format in a way that connects" with different customers and work to "legitimize" defendant's products in the "customer's eyes and wallet." Dkt. # 23–4. In his assessment of particular "values," he rated himself on a scale from 1 to 5 and provided explanations of where he had succeeded and how he could improve. In the "Career & Interest Areas" section of his evaluation, he wrote that his "realistic short and long term career interests/goals" were to "[k]eep [his] job at Lands' End." *Id.*

On February 12, 2009, the finance department published and distributed updat-

ed year-end numbers showing that plaintiff had actually met his goals for "net sales" and "variable profits" and had exceeded his goal for "fill." Ellef completed plaintiff's 2008 leadership assessment sometime in February 2009, giving plaintiff an overall rating of "inconsistent." At the time, Ellef had not seen the updated numbers. In the first section of the review, Ellef commented on the financial successes and failures of the Men's Division for the year. She noted that the division had not met all of its financial goals and that some of plaintiff's strategies had failed. Under the section "Evaluation of Development Needs & Action Plan," Ellef noted that:

- Joe ... often struggles to create compelling strategies that are broad reaching and will change the trajectory of the business. When guiding the team to build a line, Joe needs to be able to take items and build strong marketing messages around them. This not only makes a more powerful story, it also helps the teams to align and focus on the design needs, the investment, the marketing strategy and ultimately the customer experience. (example: strategy was to own polos, but there was not the how and the why the customer would choose us thought through. It wasn't until the end of the development cycle that we added color and created the point of view.)
- When communicating, Joe struggles to present a complete thought leaving the audience with a fragmented point of view. He needs to be more precise when drawing conclusions about the business and articulating them in meetings.
- Not comfortable taking risks, which often leads to a flat or declining top line. Joe relies on history to gain comfort in pushing his team or himself to take risks.

Ellef concluded the evaluation by noting that she was

concerned about [plaintiff's] ability to become successful in his current role. His developmental needs were the same for the past two years with little to no improvement. These skills are essential for a [general merchandise manager] role.

*Id.*

### G. *Plaintiff's April 6, 2009 Meeting with Fitzgerald and Ritchie*

Ellef left the company in early March before reviewing plaintiff's year-end evaluation with him. On April 6, 2009, Fitzgerald and Ritchie met with plaintiff to go over the evaluation. After reviewing the evaluation, plaintiff asked why it did not use the updated numbers showing that he had actually met his goals in net sales and variable profit. He told Fitzgerald he thought his review should be changed because meeting the three financial metrics provided him with at least a 60% "meet expectations" in his evaluation. He also pointed out that the evaluation stated that his "developmental needs were the same for the past two years with little or no improvement," even though he had not been a general merchandise manager for two years at that point.

Fitzgerald told plaintiff that she was not aware of the new numbers and that she would consider writing an addendum to his review. She went on to say that even with updated numbers, however, she would not change the overall rating of his job performance because he had scored so poorly on the non-financial factors. Fitzgerald told plaintiff that the 2008 review was a "significant setback," that he needed to "deliver transformative results" and that she was "rooting for" him. Plaintiff told Fitzgerald that he did not understood how they arrived at the performance ratings and asked her for specific examples of performance issues she had observed.

Fitzgerald could not provide any specific examples to plaintiff. Plaintiff suggested to Fitzgerald that they meet regularly to make sure that he was addressing her concerns and Fitzgerald agreed.

On April 7, 2009, plaintiff emailed Fitzgerald the updated numbers and stated that the original numbers had "colored [his] self critique." Dkt. # 23–3. He thanked Fitzgerald for "offering to add an addendum to T. Ellef's remarks about [his] 2008 performance," stated that he was "working on addressing the challenge to deliver an immediate transformative men's division financial result," and would "get key men's issues in front of" Fitzgerald "either through establishing periodic touch bases or by other means to your satisfaction." *Id.* Plaintiff contacted Fitzgerald's administrative assistant on several occasions in an attempt to schedule an appointment with Fitzgerald regarding the financial numbers used in his year-end evaluation and to talk about the performance issues to which Fitzgerald had alluded in the April 6 meeting. Plaintiff was unable to get an appointment with Fitzgerald.

### H. *Plaintiff's Conversations with Ritchie*

After the April 6, 2009 meeting, plaintiff talked to Ritchie, the Vice President of Employee Services, several times about the year-end evaluation and his performance. Plaintiff told Ritchie that the numbers he had been provided at the time of his self-appraisal were incorrect and that he wanted to change his self-appraisal, the value score and his overall score. He told her that Ellef's comments in the appraisal were wrong and inconsistent with the actual results and that he wanted his review changed to indicate overall "solid" results.

On May 11, 2009, plaintiff met with Ritchie and asked her to help schedule a meeting with Fitzgerald to discuss revising his review. Ritchie told plaintiff that numerous people had voiced concerns about his ability to succeed as Men's general merchandise manager. (The parties dispute what Ritchie told plaintiff during this meeting. According to plaintiff, Ritchie told him that he was viewed as the "wrong person" for the Men's general merchandise manager position and that the "right" person would know how to "drive market share[,] . . . market to Jack and Gary" and "would be younger and would know how to market to a younger customer." Plt.'s Dep., dkt. # 17, at 142–44. Ritchie denies saying that plaintiff was viewed as the "wrong person" or that the right person would be "younger.")

On May 13, 2009, plaintiff emailed Ritchie asking when they could "meet to follow up on our Monday discussion concerning your decision that I am the wrong person to be the Men's [general merchandise manager] and to correct my appraisal so that it refers to an accurate set of facts?" Dkt. # 29–7. Ritchie responded two days later, stating that she and Fitzgerald were "committed to providing you the information you have requested." *Id.* She also stated that they "plan[ned] to revise the numbers in your review and be clear on our expectations of you in the [general merchandise manager] role." *Id.*

### I. *Plaintiff's May 25, 2009 Meeting with Ritchie and Fitzgerald*

Plaintiff met with both Fitzgerald and Ritchie on May 25, 2009. Ritchie said that the purpose of the meeting was to bring closure to the year-end review and to look forward to how plaintiff might proceed. Fitzgerald acknowledged that plaintiff's 2008 review was based on erroneous numbers and that he had met all of his financial goals. She said that she was not going to change his review score or the comments because his value assessment was so poor. Plaintiff asked Fitzgerald to provide more detail or a specific example where his

performance missed the mark, but she declined to provide any specific information. Fitzgerald told plaintiff that she was surprised he did not see his own deficiencies because they were obvious and his peers had noticed them. When plaintiff asked which of his peers thought he had deficiencies, Fitzgerald told plaintiff she was not comfortable giving him that information.

### J. *Fitzgerald's "Performance Follow-up Memo"*

On May 28, 2009, Fitzgerald wrote a "Performance Follow-up" memo. (The parties dispute whether plaintiff ever received the memo. Plaintiff denies receiving it and states that he did not see it until he was provided a copy of defendant's response to his age discrimination complaint more than six months after his termination. Fitzgerald says that she gave him a copy, though it is not clear when or in what context she gave it to him.) In the memo Fitzgerald wrote that she thought it was "important to clearly communicate and reinforce the expectations" of him and her "continued concern[s] with [his] performance." Dkt. # 23–5. She wrote that:

> While the year end financials were favorable and result in the 'Meets' category, it does not change the fact that I have serious concerns about your ability to be successful in your role and deliver on the expectation I have for someone at your level. As a [general merchandise manager] with your knowledge and experience level, how you are viewed is beyond just the financials.
>
> You have expressed that you are not clear on how we have arrived at the rating and performance concerns and the fact that i[t] i[s] not evident to you has me greatly concerned. It is my intent to provide as much clarity as possible to ensure you are clear about your future in the organization.
>
> Joe, I sincerely appreciate the efforts you have put forth in the last 18 months

since moving into this role, however, your lack of credibility across your team, peer group and senior leaders is impacting [your] ability to successfully drive the business at the highest level. While there has not been one blatant example or turning point in your performance there have been multiple situations where you have struggled to answer questions with the clarity and self assurance that someone in your role needs to demonstrate. It is evident to me and those around you that your confidence is wa[ ]ning. Your inability to lead with confidence and provide strategic direction is clearly getting in the way of your success in this role.

> Over the course of the next 60 days I will commit[ ] to providing you with examples that are reflective of your performance and work toward the goal of understanding if there is a role in the organization that will allow you [t]o be successful.

*Id.*

Fitzgerald later testified that she could not recall anyone indicating that plaintiff lacked credibility and that she did not believe plaintiff lacked credibility with his team. Fitzgerald Dep., dkt. # 16, at 157–58.

### K. *May 2009 Financials*

In May 2009, defendant's management erred in its published sales numbers by crediting merchandise to the Women's Division that should have been credited to the Men's Division. In particular, three top Men's products, which had 100% or more sales increases for the season, were reported in Women's Division financial reporting. This had never happened before, and plaintiff asked the finance department repeatedly to explain how it had happened. The finance department told plaintiff it did not know how it happened and that it could not restore the numbers until the

following month. Despite these errors, the Men's Division was still beating the financial plan in May 2009 and was tracking ahead of revenue targets for the company.

On May 22, 2009, Coe emailed senior executives and managers stating that one of the company's top priorities was to "Deliver the 2009 financial plan." Coe identified "revenue" and "EBITDA" (which stands for Earnings Before Interest, Taxation, Depreciation and Amortization) as the two key components of the financial plan. By the summer of 2009, the Men's Division was meeting or exceeding its financial goals. Between February and July 2009, the Men's Division increased its Earnings Before Interest, Taxation, Depreciation and Amortization by 25.8%, while the company as a whole decreased by 9.9%. During the same time period, there was an 8.4% increase in revenue in the Men's Division, compared to a company average of 2.0%.

### L. *June 1, 2009 Meeting and Followup Email*

On June 1, 2009, a meeting was held regarding the Men's 2010 Spring and Summer season. Plaintiff prepared an agenda for the meeting. Fitzgerald and Coe were among the people attending the meeting. Before the meeting, plaintiff had worked with the Design division to set up two distinct visual displays: one for "Gary" and the other for "Jack." At the meeting, plaintiff led everyone through the two displays, separately presenting the customer, key outfits, marketing ideas and pricing strategies for Gary and Jack. During a lunch break at the meeting, Fitzgerald told plaintiff he was "not articulating the strategy." Plaintiff told Fitzgerald that he disagreed. Later, Fitzgerald sent plaintiff and Ramirez an email message stating, "We didn't clearly articulate a strategy for Men's Division and how the strategy may differ from Gary to Jack." Dkt. # 23–6.

She stated that, "We walked away without our key partners and leadership understanding the key growth strategies. We owe back [sic] a strategy document that clearly outlines and quantifies strength. We also walked away without a clear understanding of assortment by classification including key items." *Id.*

### M. *Fitzgerald's June 14, 2009 Email to Plaintiff*

Sometime before June 14, 2009, Fitzgerald issued a general directive to all general merchandising manager's to grow "Good tier." "Good" was a product category, with the other two categories being "Better" and "Best." Fitzgerald had directed the division managers to "grow Good" because many divisions had too much Better and Best.

On June 14, 2009, Fitzgerald emailed plaintiff that "Direction was to grow Good tier. You have made smaller. With comp info and success in promo pricing, this is the wrong direction as we have discussed. Please ensure asst, pricing and margin gets us to min. 65% good, 30% better, 5% best. Please forward backup data that supports Monday am." Dkt. # 23–8. A report dated July 2, 2009, showed that 73% of products in the Men's Division in 2009 were in the Good category; for 2010, scheduled 71.7% of the products in the Men's Division were scheduled to be in the Good category. Dkt. # 29–10.

### N. *July 15, 2009 meeting with Ritchie*

On July 15, 2009, plaintiff met with Ritchie at her request. Ritchie said that she wanted to be sure there were no surprises between plaintiff's understanding of his performance and Fitzgerald's. Ritchie said that Fitzgerald continued to believe that plaintiff was not the right person for the job. She asked plaintiff whether he had received any more feedback from Fitzgerald and plaintiff said that he had not.

### O. *Plaintiff's Termination*

Generally, division managers are given a written mid-year review in August or September. Plaintiff was not given a mid-year review. It is also defendant's policy to provide coaching and feedback to help employees understand what they need to do to meet expectations and to work continually with the employee to try to improve their job performance.

On September 1, 2009, plaintiff met with Ritchie and Fitzgerald. Ritchie told plaintiff that they were "making a change" and Fitzgerald said that "[i]t was a tough decision" but that plaintiff "wasn't a good fit." No other reason was given for terminating plaintiff. He was 56 years old at the time. Fitzgerald asked plaintiff whether he had any questions. He said he had none and left the room. Fitzgerald had consulted with Coe before terminating plaintiff and Coe had approved of plaintiff's termination. Ritchie also "signed off" on plaintiff's termination.

Shortly after terminating plaintiff, Fitzgerald told Ernesto Ramirez and Nir Patel, a senior merchant in the Men's Division, that plaintiff had been discharged. Fitzgerald told them that Coe was "taking the company in a new direction." Coe then met with Ramirez and asked Ramirez what he thought about the decision to terminate plaintiff. Coe told Ramirez that he was taking the company in a new direction. Ramirez told Coe that he was surprised, disappointed and sad, that he had a great deal of respect for plaintiff and that he was a great mentor and leader for the Men's team.

### P. *Nir Patel*

Patel was hired in March 2009 as a senior merchant in the Men's Division. He was 27 years old at the time and had no prior menswear or catalog experience. Coe, Fitzgerald and Ritchie, among others, interviewed Patel and were involved in the decision to hire him. Although plaintiff was considered Patel's supervisor and supervisors ordinarily interview potential subordinates, plaintiff was not involved in the decision to hire Patel and only learned of the hiring after the fact. Patel's starting salary was $195,000. Plaintiff's salary at the time was $175,000. (Defendant says that Patel was offered a higher salary to attract him to Wisconsin.)

After plaintiff was terminated, Patel assumed many of plaintiff's job responsibilities. On April 12, 2010, Patel was officially promoted to the Men's general merchandise manager position. He was 28 years old at the time.

### OPINION

To prevail on a claim under the Age Discrimination in Employment Act, plaintiff must prove that age was the "but for" cause of his termination. *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). In other words, "plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Communications Services, Inc.,* 574 F.3d 447, 455 (7th Cir.2009). This does not mean that plaintiff must prove that age was the only reason for the adverse employment action. The phrase "but for" is another way of saying that a particular reason is a "necessary condition" of an event. *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir.2011). The relevant question is "whether the employer would have fired . . . the employee if the employee had been younger than 40 and everything else had remained the same." *Gehring v. Case Corp.,* 43 F.3d 340, 344 (7th Cir.1994).

Plaintiff may prove discrimination either directly by presenting direct or circumstantial evidence of discrimination, or indirectly using the burden-shifting approach in *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Silverman v. Board of Education of the City of Chicago,* 637 F.3d 729, 733 (7th Cir.2011). Under both methods, the ultimate question is not whether the evidence "fit[s] into a set of pigeonholes," *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996), but simply whether a reasonable jury could find that defendant discriminated against plaintiff because of a characteristic protected by the statute, in this case plaintiff's age. *Simple v. Walgreen Co.,* 511 F.3d 668, 670–71 (7th Cir.2007) ("[T]the straightforward question to be answered in discrimination cases is whether the plaintiff has successfully demonstrated that she was the victim of … discrimination on the part of the employer.") (internal quotations omitted).

■ Plaintiff contends that he has enough direct and circumstantial evidence of discrimination to defeat summary judgment using the direct method of proof. In particular, plaintiff contends that a jury could infer discrimination from the evidence that (1) plaintiff was instructed to take a "back seat" while a younger employee presented the New Traditionalist line plaintiff had created; (2) plaintiff was excluded from the interviewing and hiring of Nir Patel; (3) plaintiff was ultimately replaced by Patel, who was much younger and had less experience than plaintiff; (4) defendant failed repeatedly to provide plaintiff justification for his low performance review and clear feedback about his performance; (5) the Women's Division was credited with sales in May 2009 that should have been credited to the Men's Division; (6) one of defendant's top human resources employees told plaintiff that he was viewed as the "wrong person" for his job and that the "right person would be younger and would know how to market to a younger customer"; (7) defendant's reasons for terminating plaintiff were pretextual; and (8) defendant treated similarly situated employees younger than plaintiff more favorably. Plaintiff contends that if a jury considered all of this evidence together, it could infer intentional discrimination by the defendant. *Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498, 504 (7th Cir.2004) (plaintiff can prevail under direct method "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker' ") (citation omitted).

Defendant contends that plaintiff's theory relies too much on speculation and conspiracy theories and none of the evidence points directly to a discriminatory motive on the part of Fitzgerald, the person who decided ultimately to terminate plaintiff. I agree with defendant that some of the evidence on which plaintiff relies does not "point directly to a discriminatory reason for the employer's action," as required under the direct method of proof. *Adams v. Wal–Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003). In particular, the fact that plaintiff's supervisor Tara Ellef instructed a younger employee to present plaintiff's New Traditionalist line at a meeting is not evidence that plaintiff was terminated later because of his age. Ellef no longer worked for defendant at the time plaintiff was terminated, and plaintiff has not suggested that Ellef played any role in his termination. Thus, even if Ellef was biased against plaintiff because of his age, that would not be evidence that Fitzgerald, Coe or Ritchie terminated plaintiff later because of his age. Similarly, plaintiff's evidence that he was excluded from the hiring process for Nir Patel and that the finance department failed to credit the Men's Division with certain sales does not support plaintiff's age discrimination claim. Plaintiff has adduced no evidence suggesting that the people responsible for arranging the interviewing schedule for Patel or

the finance department were involved in plaintiff's termination.

Nonetheless, I conclude that plaintiff has adduced other circumstantial evidence from which a jury could infer that he was terminated on the basis of his age. Plaintiff has shown that he was replaced by a substantially younger employee, Nir Patel, who had far less experience than plaintiff generally and no experience at all with menswear or catalog sales before he started working for defendant. Defendant has made no effort to explain why it believed Patel possessed qualities that plaintiff allegedly lacked. As the Supreme Court has noted, in the age discrimination context, replacement of the plaintiff by someone substantially younger can be a "reliable indicator of age discrimination." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). *See also Duncan v. Fleetwood Motor Homes of Indiana, Inc.,* 518 F.3d 486, 491–93 (7th Cir.2008) ("Duncan's replacement was more than 10 years younger, and thus suggestive of age discrimination," and defendant did not assert that person replacing plaintiff possessed characteristics and requirements it found lacking in plaintiff).

■ Plaintiff's most significant evidence is Ritchie's alleged statement to plaintiff that he was thought to be the "wrong person" for the position of Men's general merchandise manager and that the "right person would be younger and would know how to market to a younger customer." It is well established that "statements evincing a discriminatory attitude toward the plaintiff" constitute "circumstantial evidence that 'point[s] directly to a discriminatory reason for the employer's action.'" *Prochaska v. Menard, Inc.,* 829 F.Supp.2d 710, 725 (W.D.Wis.2011) (quoting *Adams,* 324 F.3d at 939). Ritchie's statement evinces a discriminatory attitude because it suggests that someone of plaintiff's age could not perform the job of Men's general merchandise manager successfully. Although defendant denies that Ritchie made the statement, I must accept plaintiff's version of events for the purpose of summary judgment. *Loudermilk v. Best Pallet Co.,* 636 F.3d 312, 314 (7th Cir.2011) ("When ruling on a motion for summary judgment, the party opposing the motion gets the benefit of all facts that a reasonable jury might find."). (Defendant objects to the statement on the ground that plaintiff did not present the statement to the Equal Rights Division investigator as part of his administrative complaint, but it is mistaken. The letter from plaintiff's counsel to an investigator in the Equal Rights Division, includes an allegation about Ritchie's alleged statement on page 3. Dkt. # 28–8 at 3.

Defendant argues that even if Ritchie made the statement and it is admissible, it is not evidence that plaintiff was terminated because of his age because Ritchie made the single, isolated statement three-and-a-half months before plaintiff was terminated. Defendant is correct that the court of appeals has stated on numerous occasions that a plaintiff cannot prove her case with "stray remarks" or "isolated comments" unless a decision maker made them "around the time of the decision" and "in reference to the adverse employment action." *E.g., Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 721 (7th Cir.2008); *Hemsworth v. Quotesmith.Com,* 476 F.3d 487, 491 (7th Cir.2007); *Steinhauer v. DeGolier,* 359 F.3d 481, 487–88 (7th Cir.2004). However, these cases are best read to mean that discriminatory remarks must meet that standard when the plaintiff has no other evidence. It does not mean that these statements are irrelevant or otherwise inadmissible. *Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1115 (7th Cir. 2009) (courts "must consider evidence of discriminatory remarks, despite being at-

tenuated from the adverse employment action, in conjunction with all of the other evidence of discrimination to determine whether the plaintiff's claim can survive summary judgment"); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 152–53, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (criticizing lower court for discounting age-related comments that "were not made in the direct context of Reeves's termination."); *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 666 (7th Cir.2006) ("how recent the comments were, how extreme, and who made the remarks are pieces of evidence that inform whether there was a 'mosaic of discrimination' ").

In this case, Ritchie allegedly told plaintiff that the Men's general merchandise manager should be "younger" approximately three-and-a-half months before he was terminated. The court of appeals has stated that "three to four months between a remark and an employment action is not so long as to defeat the inference of a causal nexus." *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 632 (7th Cir.2009). However, defendant is free to argue to the jury that it should not consider the statement because it occurred months before plaintiff's termination and was unrelated to it. *Lust v. Sealy, Inc.*, 277 F.Supp.2d 973, 984 (W.D.Wis.2003) ("Of course, the older and more tangentially related the comment is, the less probative value it has ... But this is generally an issue that goes to the weight and not the admissibility of the evidence."). In response, plaintiff is free to argue that the statement is relevant because it was made in the context of discussions leading up to plaintiff's termination and was specifically about plaintiff's abilities and performance.

Defendant also argues that the statement is not evidence of a discriminatory motive for plaintiff's discharge because Ritchie was not the final decision maker regarding plaintiff's discharge and she was merely expressing her own opinion. However, defendant's argument that only Fitzgerald should be considered the final decision maker is not persuasive. Plaintiff has adduced evidence from which a jury could infer reasonably that Ritchie, Fitzgerald and Coe were involved in the decision to discharge plaintiff. As the Senior Vice President of Employee Services, Ritchie reviewed and approved plaintiff's termination before it occurred and was present when he was terminated. Ritchie was also involved in discussions with Fitzgerald and others regarding plaintiff's position. She participated in plaintiff's April performance review, communicated with him regarding his attempts to follow up with Fitzgerald, met again with plaintiff and Fitzgerald regarding the review in late May and met with plaintiff again in mid-July. With respect to Coe, he was the president of the company and stated in his deposition that Fitzgerald discussed plaintiff's termination with him and that he approved of it. When Fitzgerald told plaintiff he was being terminated, she stated that *Coe* was taking the company in a new direction. Later, Coe told Ramirez that he was taking the company in a new direction. A reasonable jury could conclude that, at the very least, Coe's opinion of plaintiff influenced Fitzgerald's decision to terminate plaintiff.

Additionally, a reasonably jury could conclude that when Ritchie told plaintiff that he was the "wrong person" for the general merchandise manager position and that the "right person would be younger," Ritchie was expressing an opinion about plaintiff's abilities shared by her, Fitzgerald and Coe. Ritchie stated at her deposition that shortly after Coe became the president of defendant, he told Ritchie that plaintiff was the "wrong person" for the job and that he expressed that opinion on multiple occasions. A jury could reasonable infer that Ritchie was relaying Coe's

opinion to plaintiff during the May 11 meeting. Ritchie also stated at her deposition that the reason she met with plaintiff during spring 2009 was to make sure he understood *Fitzgerald's* concerns and expectations. Thus, a jury could infer that Ritchie was expressing Fitzgerald's opinions to plaintiff during the meeting. Ritchie's statement is ambiguous and could be interpreted in multiple ways. It should be left to a jury to decide whether the statement was truly evidence of a discriminatory motive for plaintiff's termination. *Kasten v. Saint–Gobain Performance Plastics Corp.,* 703 F.3d 966, 974 (7th Cir.2012) (question whether vague and ambiguous statement expressed retaliatory intent was question for jury); *Duncan,* 518 F.3d at 493 ("Perhaps Stucky's words could be construed differently, but finding meaning in ambiguous statements is the province of the jury."); *Phelan v. Cook County,* 463 F.3d 773, 782 (7th Cir.2006).

Finally, plaintiff has also adduced evidence that defendant offered "pretextual" reasons for his discharge. A pretext is "a deliberate falsehood." *Forrester v. Rauland–Borg Corp.,* 453 F.3d 416, 419 (7th Cir.2006). To establish pretext the plaintiff must do more than show that the defendant's decision was mistaken, unfair or foolish. *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 839 (7th Cir.2009). Rather, the plaintiff must adduce evidence that the defendant's reasons for its decision are not worthy of belief. *Silverman,* 637 F.3d at 743–44. Evidence of pretext is evidence of discrimination because, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097.

When Fitzgerald and Ritchie terminated plaintiff, they told him only that he "wasn't a good fit." Defendant tries to clarify this statement by adding that plaintiff was fired because he "failed to articulate a clear business strategy that Fitzgerald had confidence in to turn the Men's Division around" and that this message was communicated to him "numerous times" in the months leading up to his termination. Dft.'s Br., dkt. # 21, at 26. It also states that plaintiff was "struggling" and could not "articulate his business." Defendant is correct that it could legally terminate an employee who was failing to meet its legitimate expectations. Additionally, the fact that plaintiff received a poor performance review and repeated admonishments before being discharged is evidence that he was fired for poor performance and not a discriminatory reason. *Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1146 (7th Cir. 1994) (plaintiff fired "after a series of negative reports had accumulated during that year"); *Karazanos v. Navistar International Transportation Corp.,* 948 F.2d 332, 336 (7th Cir.1991) (plaintiff put on probation and received poor evaluation before being fired).

On the other hand, "[a]n employee may demonstrate that his employer's reason was pretextual by showing that the reason had no basis in fact," *Marion County Coroner's Office v. EEOC,* 612 F.3d 924, 929 (7th Cir.2010), and plaintiff has adduced evidence that undermines defendant's purported reasons for discharging him. Specifically, plaintiff has shown that he was meeting all financial goals set by defendant for the Men's Division and that he had presented new, successful strategies for the division. Although defendant attempts to downplay plaintiff's financial successes, it concedes that financial metrics were very important and that it evaluated its division managers, in large part, on the basis of their ability to achieve financial goals. Plaintiff has shown that

he was the *only* division manager to meet or exceed all of his financial metrics for 2008, and that in spring 2009, he met or exceeded all of his financial goals for the Men's Division, while other divisions were struggling. Although defendant argues that sales promotions, not plaintiff, were responsible for the success in the Men's Division, plaintiff adduced evidence from which a jury could conclude otherwise, including the evidence that the Men's Division did not use promotions until 2009 and did not use any promotions specific to Men's.

With respect to innovation and "driving the business," plaintiff has adduced evidence that he introduced new and innovative products and marketing techniques to the Men's Division. He introduced the "essential project" and a new shirt that generated significant revenue, he initiated the New Traditionalist line, about which Coe and others were very enthusiastic, and he introduced a new method for presenting products and ideas during business meetings. Plaintiff also provided evidence that his former colleagues and subordinates thought he was an articulate presenter, good leader and mentor and had good knowledge of the business. Defendant has adduced no evidence except the vague criticisms of Fitzgerald, Coe and Ritchie that contradicts plaintiff's evidence. From plaintiff's evidence, a reasonable jury could disbelieve defendant's contention that plaintiff was fired for performance reasons.

A reasonable jury could also conclude that defendant's criticisms of plaintiff's performance are pretextual because they were so vague. *Hurlbert v. St. Mary's Health Care Systems, Inc.*, 439 F.3d 1286, 1298 (11th Cir.2006) ("[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."). Defendant cites repeatedly to Fitzgerald's,

Coe's and Ritchie's assertions that plaintiff was "struggling" and "not able to run his business." The problem for defendant is that it has failed to state clearly how plaintiff was "struggling." Fitzgerald made statements to plaintiff that he needed to "deliver transformative results," that he "lack[ed] credibility across his team, peer group and senior leaders" and that he needed to "lead with confidence." However, when plaintiff asked for specific examples, Fitzgerald gave him none. Later, she admitted that plaintiff did not "lack credibility with his team." Even in her "Performance Follow–Up" memo, in which she wrote that it was her "intent to provide as much clarity as possible," Fitzgerald failed to identify any specific example of where plaintiff was falling short. In the subsequent weeks and months, plaintiff asked repeatedly for specific examples of performance issues, and neither Ritchie nor Fitzgerald were able to provide them. Instead, if plaintiff is believed, Ritchie told him that he was the "wrong person" for the job, not a "good fit" and that the "right person would be younger."

Defendant points to two emails Fitzgerald sent to plaintiff in June 2009 as evidence that Fitzgerald honestly believed plaintiff was doing his job poorly and provided him specific examples of his deficiencies. In one of the emails, Fitzgerald criticized plaintiff for failing to have at least 65% of Men's products fall within the "Good" category. This appears to be an unfair criticism, as records show that Men's had more than 70% of its products in "Good." In the other email, Fitzgerald criticized the presentation of the merchandising aspect of the "Jack" and "Gary" lines at a business meeting, stating that plaintiff failed to provide a clear strategy. Defendant also argues that the court should not second-guess its termination decisions. *Appelbaum v. Milwaukee Metropolitan Sewerage District*, 340 F.3d 573, 579 (7th Cir.2003) ("We are not, after all, a

super-personnel department that sits in judgment of the wisdom of an employer's employment decisions.").

Although a jury could accept defendant's evidence and version of events, a jury could also conclude that defendant fired plaintiff not for the performance reasons it cites, but because he had been stereotyped as "too old" to market Men's products to young customers and to succeed in his job generally. Further, without commenting on the wisdom of defendant's ultimate decision, I will note that defendant's proffered reasons for terminating plaintiff are vague and that a reasonably jury could disbelieve them. *Duncan,* 518 F.3d at 491–92 ("Even when an employer has proffered what appears to be a legitimate, nondiscriminatory explanation for its conduct, summary judgment will not be appropriate if the aggrieved employee produces evidence from which a jury reasonably could find that the stated explanation is false and that the real reason was discriminatory.").

Finally, defendant contends that Fitzgerald's role in promoting plaintiff in 2007 precludes a finding that she terminated plaintiff later because of his age. That is, if Fitzgerald disliked older workers, she would not have promoted him when he was 53 and then fired him when he was 56. That is a valid point, but it is better made to the jury. Although the court of appeals has noted that it may be "unlikely for a person to suddenly develop a strong bias against older folks," *Martino,* 574 F.3d at 454–55, both the Supreme Court and the court of appeals have counseled against relying on psychological assumptions such as this in the context of a motion for summary judgment or judgment as a matter of law. *E.g., Reeves,* 530 U.S. at 153, 120 S.Ct. 2097 (fact "that respondent employed many managers over age 50—although relevant, is certainly not dispositive"); *Filar v. Board of Education of City*

*of Chicago,* 526 F.3d 1054, 1065 (7th Cir. 2008) (in age discrimination case, rejecting argument that defendant was entitled to inference of nondiscrimination simply because same decision maker hired and fired plaintiff).

Moreover, in this case, there is evidence that the group of decision makers who promoted plaintiff (Fitzgerald, Ritchie and McCreight) was different from the group involved in his termination (Fitzgerald, Ritchie and Coe), and that the circumstances had changed. Around the time plaintiff was fired, defendant was preparing to launch a new line of Men's clothing for younger men and Coe was planning on taking the company in a "new direction." A reasonable jury could conclude that these changed circumstances altered the decision makers' opinion about whether plaintiff's age affected his ability to succeed as a general merchandise manager. Under these circumstances, this dispute must be resolved by a jury. *Kasten,* 703 F.3d at 974 ("[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent[.]") (citation omitted).

In summary, plaintiff has adduced evidence sufficient to create a genuine dispute of material fact regarding whether his age was a "but for" cause of his termination. I need not consider the parties' remaining arguments about whether plaintiff can identify a similarly situated employee younger than he is that was treated more favorably.

### ORDER

IT IS ORDERED that defendant Lands' End, Inc.'s motion for summary judgment, dkt. # 20, is DENIED.